

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-07-00038-CR

_____


LOYD CRAIG, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 115th Judicial District Court
Upshur County, Texas
Trial Court No. 14,187


Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

Loyd Craig was romantically involved with three women, Freda Cline, Rosie Brooks, and Shaniqua Darden. Cline was shot while sitting in her car while Craig was present; the vehicle was then set ablaze, incinerating the body; Brooks admitted she shot Cline at Craig's behest; Darden insisted Craig was with her on the day of the homicide. After Brooks admitted shooting Cline, she pled guilty and was sentenced to twenty-five years' imprisonment; she testified Craig planned and directed the murder. Craig appeals his conviction for the murder of Cline after being convicted and sentenced to sixty years' incarceration. We find: 1) the trial court did not err in overruling Craig's *Batson*[1] challenge to three of the State's peremptory challenges at jury selection; 2) there was sufficient evidence tending to connect Craig to Cline's murder to corroborate accomplice Brooks' testimony; and 3) the trial court did not err in denying Craig's motion for new trial. We affirm the judgment.

I.      ***Batson* Challenge**

Craig first argues the trial court erred in denying his challenge to the State's use of peremptory strikes on three veniremembers. *See id.* A *Batson* challenge generally gives rise to a three-step process. First, the defendant must make a prima facie case that a veniremember was peremptorily excluded on the basis of race. Next, the State must come forward with race-neutral reasons for the peremptory strike. Finally, the defendant has the opportunity to rebut the State's

---

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

2

explanations. The burden of persuasion remains with the defendant to prove purposeful discrimination. In *Purkett v. Elem*, 517 U.S. 765 (1995), the United States Supreme Court explained that "unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Shuffield v. State*, 189 S.W.3d 782, 785 (Tex. Crim. App. 2006). The trial court determines whether the defendant has carried his or her burden of proving racial discrimination. *Mathis v. State*, 67 S.W.3d 918, 924 (Tex. Crim. App. 2002). The trial court's determination is accorded great deference; we will not overturn the determination unless it is clearly erroneous. *Chamberlain v. State*, 998 S.W.2d 230, 236 (Tex. Crim. App. 1999).

## A. Prima Facie Claims of Racial Discrimination and the State's Responses

Craig told the trial court, "There were three black members on the first two rows, Jerry Tennison, Shirley Hall, and Darrel Todd, and I noticed all three of them got struck."[2] We move to the State's race-neutral explanations for its strikes.[3]

---

[2]The record is not clear regarding Craig's race. The United States Supreme Court held in *Powers v. Ohio*, 499 U.S. 400 (1991), that, under the Fourteenth Amendment, "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." Therefore, the race of a defendant is irrelevant to a *Batson* challenge. *Id.* at 402; *Cook v. State*, 858 S.W.2d 467, 471 (Tex. Crim. App. 1993).

[3]Where the State offers an explanation for the challenged strike and the trial court makes its ruling, the issue of whether the defendant presented a prima facie case is moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

### 1. Veniremember Tennison

The State inquired whether potential jurors could consider the whole range of punishment, from community supervision to five to ninety-nine years or life in prison. The State said, "Mr. Tennison, you cannot consider it?" The venireman answered, "Yes sir. I just raised it [his hand] slow."

The State told the trial court Tennison "didn't raise his hand to a critical question until I looked at him and then he raised his hand and said I was just late. That indicated to me that he wasn't going to raise his hand to that question because he didn't do it until I specifically turned to him."

Further, the State indicated that, "[H]is actions indicated to me that he wasn't going along with that."

### 2. Veniremember Hall

Regarding Hall, the State explained its strike as follows:

THE COURT: Okay. What about Ms. Hall?

[State]: Ms. Hall, if you'll recall was the one that all during my voir dire she sat there like you're standing, just like this.

THE COURT: She was cold?

[State]: And -- but during [the defense] voir dire she wasn't.

THE COURT: You warmed her up, Mr. Fetter.

[State]: Whatever, but she opened up to him.

4

### 3. Veniremember Todd

The State explained its strike of veniremember Todd:

> [State]: Mr. Todd was the one if you'll recall I asked the question about O. J. Simpson and nobody raised their hand, but he was glaring at me and I made the point of going back and saying, if you'll recall I did a follow-up are you sure and I was looking directly at him because of his facial expression. He was mad at [sic] heck at me for even asking that question and that's why he got struck.

The issue for the trial court and the appellate court at this juncture is the facial validity of the explanation given. *Purkett*, 514 U.S. at 768; *Goode v. Shoukfeh*, 943 S.W.2d 441, 445 (Tex. 1997). In evaluating whether the explanation offered is race neutral, a court must determine whether the peremptory challenge violates the Equal Protection Clause as a matter of law, assuming the reasons for the peremptory challenge are true. *Goode*, 943 S.W.2d at 445. A race-neutral explanation means that the challenge was based on something other than the juror's race. *Id*. Unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race neutral for purposes of the analysis at step two. *Id*. We do not see a discriminatory intent in the State's three explanations and therefore proceed to the next step.

### B. Defense Burden to Show Pretext

Following the State's presentation of its race-neutral reasons for its peremptory strikes, the defendant then bears the burden to convince the trial court that the State's reasons are pretexts for racially discriminatory use of its strikes. The ultimate burden of proof of a *Batson* violation rests with the defendant. Craig told the trial court,

5

Mr. Tennison, you know, he might have been slow in raising up but he answered the question the same as everybody else. And Mr. Todd, you know, I don't remember the glaring and all that stuff but -- nobody raised their hand up and thought O. J. was innocent. You know, he didn't affirmatively make any statements or indicate that he disagreed.

Craig did not rebut the State's description of Hall as "cold."

Regarding Tennison, who the State said was late raising his hand to a question about considering the full range of punishment, an inability to consider the full range of punishment is a race-neutral reason for striking a veniremember. *Chambers v. State*, 866 S.W.2d 9, 24 (Tex. Crim. App. 1993);[4] *see also Yarbough v. State*, 732 S.W.2d 86 (Tex. App.—Dallas 1987), *vacated & remanded on other grounds*, 761 S.W.2d 17 (Tex. Crim. App. 1988). After asking the general question to the panel if they could consider life imprisonment as a punishment in the proper murder case, the attorney then stated, "Okay. Mr. Tennison you cannot consider it?" which suggests that Tennison either did not raise his hand or as he stated was "slow" to do so. Craig's only answer was that Tennison "answered the question the same as everybody else." However, Tennison's reaction was apparently not the same as everyone else. Even though Tennison did not give an answer indicating that he was hostile to the State, the State did identify Tennison's tardiness in answering

[4]Further, a prospective juror's inability to understand relevant legal concepts provides a race-neutral explanation for exercising a peremptory strike. *See Chiles v. State*, 57 S.W.3d 512, 516–17 (Tex. App.—Waco 2001, pet. dism'd, untimely filed) (recognizing that prospective juror's inability to understand the concepts of insanity defense and single-witness testimony constituted race-neutral reason); *Williams v. State*, 939 S.W.2d 703, 706–07 (Tex. App.—Eastland 1997, no pet.) (recognizing that prospective juror's inability to understand concept of "beyond a reasonable doubt" constituted race-neutral reason).

that he could consider a life sentence as a specific, objective reaction which the State interpreted as some hesitancy to consider the entire range of punishment. We cannot determine that such an interpretation was unreasonable or without foundation.

As for venireman Todd, the State said he was "mad at [sic] heck" and "glaring" at him when the latter asked the panel whether anyone thought O. J. Simpson was innocent. Lack of eye contact and attentiveness and no development of a back-and-forth relationship during voir dire has been upheld as a race-neutral explanation. *Townsend v. State*, 730 S.W.2d 24, 26 (Tex. App.—Texarkana 1987, no pet.). So, too, where a potential juror was "very hostile" toward the prosecutor questioning her, as demonstrated by "her facial expression, even body language, with her arms folded and peering." *Alexander v. State*, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993). The State's explanation for striking Todd was race neutral. Craig responded to the State's explanation by saying, "I don't remember the glaring and all that stuff but -- nobody raised their hand up and thought O. J. was innocent. You know, he didn't affirmatively make any statements or indicate that he disagreed." The defendant must do more than simply state his or her disagreement with some of the State's explanations. The defendant must prove affirmatively that the State's race-neutral explanations were a sham or pretext. *Webb v. State*, 840 S.W.2d 543, 544 (Tex. App.—Dallas 1992, no pet.); *Straughter v. State*, 801 S.W.2d 607, 613 (Tex. App.—Houston [1st Dist.] 1990, no pet.). As for Craig's statement to the trial court that "nobody raised their hand up and thought O. J. was innocent,"

7

there is no further discussion or questioning by either party with any other panel members on this topic.

Statements about the demeanor or appearance of veniremembers must be judged for their credibility by trial courts, whose findings must be reviewed deferentially by appellate courts. *Yarborough v. State*, 947 S.W.2d 892, 893 (Tex. Crim. App. 1997). Strikes based on claims not easily verifiable through objective proof should be viewed with "healthy skepticism," but, under this view, the skepticism is to be exercised by the trial court, not by the appellate court. *Moss v. State*, 877 S.W.2d 895, 899 (Tex. App.—Waco 1994, no pet.) (appellate court owes deference to trial court decision, which should be disturbed only if "clearly erroneous").

Craig offered no rebuttal to the State's race-neutral explanation for striking veniremember Hall. A party's failure to offer any real rebuttal to a proffered race-neutral explanation can be fatal to his or her claim. *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002); *Ford v. State*, 1 S.W.3d 691, 694 (Tex. Crim. App. 1999) (defendant failed to rebut State's reason by cross-examining prosecutor or offering rebuttal evidence).

### C.     Trial Court Not Clearly Erroneous

When reviewing a *Batson* objection, we examine the record in the light most favorable to the trial court's ruling and reverse only when the ruling is clearly erroneous. *Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002). A ruling is clearly erroneous when, after searching the record, we are left with the definite and firm conviction that the trial court has made a mistake. *Goldberg v.*

*State*, 95 S.W.3d 345, 385 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *Bausley v. State*, 997 S.W.2d 313, 315 (Tex. App.—Dallas 1999, pet. ref'd). The "clearly erroneous" standard "is a highly deferential standard because the trial court is in the best position to determine whether a prosecutor's facially race-neutral explanation for a peremptory strike is genuinely race-neutral." *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). We may not substitute our opinion for the trial court's factual assessment of the neutrality of the State's explanation for exercising strikes, and we focus on the genuineness, rather than the reasonableness, of the State's asserted nonracial motive. *Id.* at 534 & n.5 (citing *Purkett*, 514 U.S. 765).

Reviewing the record before us, we find the State presented racially neutral explanations for the three challenged strikes. Based on Craig's limited rebuttals, we are not "left with the definite and firm conviction that the trial court has made a mistake." We overrule Craig's first point of error.

## II. Corroboration of Accomplice-Witness Testimony

A conviction cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; the corroboration is not sufficient if it merely shows the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). While required by neither common law nor our Federal and State Constitutions, Article 38.14's codification reflects the Texas Legislature's determination that accomplice-witness testimony implicating another "should be viewed with some level of caution." *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); *see also Brown v. State*, 159 S.W.3d 703, 707 (Tex.

App.—Texarkana 2004, pet. ref'd) (discussing covert witness rule of Article 38.141 and its parallels to Article 38.14's accomplice-witness rule). Article 38.14 requires the corroboration of accomplice-witness testimony, but there is no exact rule as to the amount of evidence required for corroboration. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). "All that is required is that there be *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Gill*, 873 S.W.2d at 48; *cf. Jeffery v. State*, 169 S.W.3d 439, 448 (Tex. App.—Texarkana 2005, pet. ref'd) (applying similar analysis for corroboration of covert-witness testimony); *Brown*, 159 S.W.3d at 707–08. Such evidence may be either direct or circumstantial. *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988).

The test for weighing the sufficiency of corroborating evidence is to eliminate from consideration the accomplice's testimony, and then examine the remaining testimony and evidence to determine if there is evidence that tends to connect the defendant with the commission of the offense. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); *Reed*, 744 S.W.2d at 125; *Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd). The nonaccomplice testimony does not have to directly link the accused to the crime, it alone need not establish guilt beyond a reasonable doubt, and it need not prove all the elements of the alleged offense. *Gill*, 873 S.W.2d at 48; *Munoz*, 853 S.W.2d at 559; *Reed*, 744 S.W.2d at 126; *Jeffery*, 169 S.W.3d at 448. The accused's presence at the scene of the crime is, by itself, insufficient to corroborate an accomplice's testimony. However, "evidence that an accused was in the company of the accomplice close to the

10

time of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Gill*, 873 S.W.2d at 49; *see also Reed*, 744 S.W.2d at 127; *Jeffery*, 169 S.W.3d at 447; *Brown*, 159 S.W.3d at 708. Moreover, while evidence that addresses only motive or opportunity to commit the crime is, by itself, insufficient to corroborate the accomplice-witness testimony, motive or opportunity evidence may be considered in conjunction with other evidence tending to connect the accused to the crime. *Reed*, 744 S.W.2d at 127. "Cumulative evidence of 'suspicious circumstances' may be sufficient even if none of the circumstances would be sufficient individually." *Jeffery*, 169 S.W.3d at 447; *see also Brown*, 159 S.W.3d at 708. In the end, every case "must be considered on its own facts and circumstances--on its own merit." *Munoz*, 853 S.W.2d at 559; *see also Reed*, 744 S.W.2d at 126.

### A. Craig's Accomplice, Rosie Brooks

Cline had been living with Craig until a few days before her death. Brooks testified that, two days before the murder, she met with Craig and "someone had told him that Freda was out to get him and that she was going to make him pay and he had asked me if I would shoot her and I told him that I would." On the day of the murder, Brooks got Craig's truck from him. Craig and Cline were together in a Dodge Intrepid. They all drove to Eric Harper's house, where Craig and Cline sat in Cline's car in Harper's front yard. When Craig and Cline left, Brooks followed; she got the truck stuck, and Craig called Harper, who came and extricated Brooks and the truck. Brooks testified she followed Craig and Cline "through the country" to an area near Mule Deer and Minx Roads; Craig

11

was outside Cline's car, talking to Cline, who was seated in the driver's seat, when she began apologizing for seeing other men. Brooks said that, at Craig's instruction, she got a pistol he had behind his back. When Cline begged Craig to tell Brooks not to shoot her, Craig said it was not up to him, it was up to Brooks. Brooks also said Craig told her that, if she did shoot Cline, to be sure and shoot her in the head. After Brooks shot Cline, Craig then retrieved a jug of gasoline, which Brooks had purchased at Craig's instruction, from the truck and told her to turn the truck around. Craig then poured the gasoline on Cline and her car and set them ablaze. Craig got in the truck with Brooks, and they left.

Brooks acknowledged that, in her first statement to law enforcement officers, she stated Craig was not with her at the time of the murder.

### B.    Nonaccomplice Testimony

Setting aside Brooks' testimony, we now consider only other evidence which tends to connect Craig to Cline's murder. Harper testified that, on the night now identified as the night of the murder, Craig pulled into Harper's front yard in a vehicle that looked like Cline's Dodge Intrepid. There was another person in the car with Craig, but Harper could not tell the person's race or gender. Harper said Brooks parked in his yard Craig's blue Chevrolet truck she was driving. When the two vehicles and their occupants then drove away from Harper's residence, Brooks got stuck; Craig called Harper, and he came out and helped get the vehicle out. Cell phone records verify that several calls from

12

Craig's phone were made to Harper's phone on the night of the murder. These incidents corroborate Brooks' testimony and tend to connect Craig to the events preceding the murder.

A few days later, Harper received a call from Craig asking him to meet with Craig at Craig's mother's house. Craig asked Harper if he had heard what happened, to which Harper replied, "I think so." Craig then told him "it" had happened that night, when Brooks and Craig were in the two vehicles in Harper's yard. From the context of the questioning and testimony of this portion of the reporter's record, "it" refers to the death of Cline. Harper said Craig told him the police might come talk to Harper, and Craig had forgotten to tell the police he had been at Harper's house the night of the murder. Craig told Harper that, if Harper told police Craig had been to Harper's house that night, Craig would have to tell police he had forgotten to tell them he had been to Harper's. Harper testified he got nervous and left.

In his written statement, Craig maintained he was with Darden at all times during the night of the murder. However, in an oral statement given to investigators, and received in evidence, Craig admitted he and Brooks drove up and down Mule Deer Road where Cline's burned car and remains were found. Darden, at one time, told police Craig instructed her to tell them he was with her all day on the day of the murder.[5] The State also introduced evidence Craig had dialed Cline's cell phone

[5]Darden gave two statements to the police. The first said that Craig had been with her from the afternoon through the night of the murder; in her second statement, she refuted the first and said Craig had told her what to say. At trial, Darden testified in line with her first statement and said she had been threatened by law enforcement with loss of her children to Child Protective Services if she did not give a story inculpating Craig. The interviewing officers testified they never made such threats.

13

111 times the day before the murder and only four times on the day of the murder (all four occurring before 10:00 a.m.). Evidence that an accused was in the company of the accomplice close to the time of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense. *Gill*, 873 S.W.2d at 49.

There was sufficient evidence tending to connect Craig to Cline's murder; we overrule this point of error.

### III.     Motion for New Trial, Claiming Newly Discovered Evidence

Craig's third point of error claims the trial court erroneously denied Craig's motion for new trial.

Article 40.001 of the Texas Code of Criminal Procedure provides that "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. ANN. art. 40.001 (Vernon 2006). Under that statute, a defendant is entitled to have his or her motion for new trial granted if (1) the newly discovered evidence was unknown to the defendant at the time of trial; (2) the failure to discover the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *Keeter v. State*, 74 S.W.3d 31, 36–37 (Tex. Crim. App. 2002).

14

Not only does the decision to grant or deny such a motion fall within the sound discretion of the trial court, subject to reversal only on a finding of an abuse of that discretion, but these motions are generally disfavored by the courts and viewed with great caution. *Fox v. State*, 175 S.W.3d 475, 484 (Tex. App.—Texarkana 2005, pet. ref'd).

Craig's amended motion for new trial claimed entitlement to relief because a newly discovered letter, purportedly from accomplice Brooks to Craig's sister, implicated some other unknown male and said Craig was not involved. In the letter, Brooks denied responsibility for Cline's murder and said she was just at the scene and saw the murder. At the hearing, Craig's sister Teresa Walton said she had received a letter from Brooks sometime in 2004, but put it in a plastic bag with her other mail to be sorted later. She could not find it in time for trial, but did find it in time for the hearing on the motion for new trial.[6] At the hearing, both Walton and Craig's other sister, Pamela Allen, testified they were aware of the contents of the letter and had told both Craig and his trial attorney of the letter and its contents, prior to the trial. This is fatal to Craig's appellate point of error, as the new evidence relied on for a new trial must have been unknown to the defendant at trial. *See id.* at 485. While we do not address whether the letter was admissible, we point out that it would at most be available for the purpose of impeaching Brooks' trial testimony.

---

[6]The trial was December 4–6, 2006; the motion for new trial was heard February 13, 2007.

15

Further, even if the letter had been admitted into evidence at trial, it would be reasonable for the trial court to conclude it was not probable that such evidence would bring about a different result. Undisputedly, Brooks at one time made statements that absolved Craig from all responsibility for the murder and later changed her statement. Even if this letter was found to be authentic, it would have added little to Brooks' previous testimony that Craig was not even present when the murder was committed. That testimony was already before the jury, and Brooks' credibility was thoroughly examined at the trial for this very reason. We overrule this point of error.

We affirm the trial court's judgment.


Jack Carter
Justice


Date Submitted:     December 4, 2007
Date Decided:       January 10, 2008

Do Not Publish